Good morning, Your Honor, and may it please the Court. Whenever you're ready. Kathleen Hunker, on behalf of Secretary Nielsen, Mr. Gore from the interveners will speak after me and address the statutory interpretation question. In v. v. Abbott, this Court identified a gap in Texas election law that compromised voter integrity. Namely, Texas required a photo ID to vote in person, but it had no comparable rule for voting by mail. SB 1 fixes this gap the same way that Congress fixed it in Hoppe. SB 1's identification number requirement does not violate the materiality provision. The district court erred holding otherwise for at least two core reasons. First, the information is in fact material because it helps confirm the voters identity. Second, the district court did not have jurisdiction over the secretary because she does not enforce the statute. The district court committed clear error when it held as a matter of law that the identification numbers were not material in determining whether a voter was qualified to vote. As we explain in our briefs, states have separate bodies of law governing different stages of the voting process. The first stage deals with voter registration and specifically deals with who is qualified to vote. The second stage, ballot casting, deals with how that qualified voter makes their vote effective. The reason this distinction matters is because even assuming the materiality provision applies here, ballot casting rules serve an entirely different purpose than voter registration rules. And as a consequence, the question of what is material differs. The district court did not draw this distinction. Instead, it took the identification numbers and compared that to the substantive eligibility criteria listed in section 11.002 of the election code. And because it did not find a match, the district court struck down the law. This mistake alone is grounds for reversal. As this court recognized in vote.org, the undeniable premise behind every statutory qualification is that the person who's trying to vote is who they say they are. The state has an obvious interest in confirming the identity of the voter, and that interest only grows each stage of the voting process. And it is particularly acute in voting by mail when the applications and ballots are submitted far removed from any government office or employee. This is where SB one comes in. SB one built off of what Congress started in Hava. It has voters enter their nonpublic Social Security number or state identification number. The same two numbers that Congress requires voters to provide at voter registration and uses that to confirm that the person who's submitting the form is the same person who is listed on the team's database as being a qualified voter that they are one in the same. In short, it creates the vote by mail equivalent to Texas's photo I. D. Law. Now, plaintiffs in their brief do not appear to contest that Texas has significant, if not compelling interest in confirming the voters identity. What they object to is the method that Texas has chosen and whether that method has a meaningful connection to Texas's purported interest of confirming the voters identity. The simple answer is that yes, it does. And plaintiffs have come nowhere near their burden of proof necessary to establish otherwise, given that they have brought a facial challenge and given the considerable discretion the states have not only in regulating their elections, but also in deciding what is the adequate level of effectiveness their policies will have in advancing their interest. Overall, S. P. One and the identification number requirement does its job well. Now that voters and election officials have had time to become more familiar with the law, rejection rates have declined to where they were pre S. P. One and in some counties have even gone lower. The requirement in short, meaningfully, even if quite imperfectly, corresponds to the state's substantial interest in verifying the voters identity and ensuring that there is voter integrity within Texas elections. I now want to quickly turn to jurisdiction. The secretary is not a proper defendant. As this court recognized just as recently as last October, the secretary does not enforce S. P. One. The challenge provisions here are no exception to that fact. Each of the officials who have the specific duty under the election code to reject noncompliant A. B. B. M. S. And carrier envelopes. Plaintiff's principle response is that the secretary prescribes official forms, including A. B. B. M. S. And carrier envelopes. However, in this instance, the form did not cause the plaintiff's injury and enjoining the secretary from designing it or making amendments to the design would not redress plaintiff's alleged injury, even in the slightest. If anything, it would likely make the injury worse. And this is because local election officials have an independent obligation to evaluate A. B. B. M. S. And carrier envelopes and reject any whose number listed on the form does not identify the voter on the registration file. The same would happen here. That's even if the secretary were to change the form, the rejections would still take place. Voters would just have a harder time complying. There is an example of this in the record. Back in January 2022, when S. B. One first took effect, many voters submitted A. B. B. M. S. Using the old forms where there was no place on the form for the identification number. These A. B. B. M. S. Were rejected unless the voter took the additional step of adding their numbers to the forms. This fact distinguishes S. B. One from Texas Democratic Party and other cases where the plaintiff's objection was to the form itself, or we're changing the form would give some relief. That is not the case here. Moreover, this court has acknowledged that Article three standing and its sovereign immunity standing with respect to ex parte young significantly overlap. And with respect to the private plaintiffs, O. C. A. Greater Houston and Rev up and the others listed on the caption for the same reason that they cannot establish redress ability or trace ability. They can also not establish the exception to ex parte young because there is no enforcement connection. With that, Your Honor, unless there's any questions, I give the rest of my time to Mr Gore. Miss Hunker. Thank you very much. Thank you. Mhm. Mr Gore, you have seven minutes. Thank you, Your Honor, and may it please the court. Congress did not preempt all paper based state voting laws in the materiality provision. Rather, it remedied a serious and specific problem discriminatory acts by state and local election officials to prevent qualified individuals from registering to vote. Accordingly, every federal appellate's decision still on the books that has applied the provision has involved a voter qualification rule. On the other hand, the Third Circuit, the lone circuit to have addressed the question, has held that the provision does not even apply to ballot casting rules. In the words of the Third Circuit, the provision only applies when the state is determining who may vote and does not apply to rules that govern how a qualified voter must cast his ballot for it to be counted. Three justices of the U. S. Supreme Court and prior panels of this court have indicated that the Third Circuit's reading is correct. The SB 1 identification rules challenged here are not used to determine who may vote in Texas. Instead, they govern how a qualified Texas voter completes an absentee ballot and application. They therefore do not even implicate, let alone violate the materiality provision. The district court's flawed holding would outlaw all paper-based state voting laws that have nothing to do with voter registration, including rules that combat fraud, promote election integrity, and make mail voting possible in the first place. So this court should reverse. In at least three ways, the plain statutory text confirms that the provision does not reach ballot casting rules like SB 1's identification rules. First, those rules do not relate to any application, registration, or other act requisite to voting. That statutory element refers to documents used in voter registration specifically, but SB 1's identification rules do not relate to such documents. They relate instead to absentee ballots and applications. Second, the provision extends only to rules used in determining whether an individual is qualified to vote. That element describes the process by which election officials determine whether an individual is qualified. But SB 1's identification rules don't apply to that process either. They apply at a later stage to determine the validity of a ballot or a request for a ballot. Third, the provision prohibits only actions that deny the right of any individual to vote. But SB 1's identification rules don't do that either for at least two reasons. In the first place, the rules regulate mail voting. And as this Court has held, regulations on mail voting do not deny the right to vote. Second, the rules do not prohibit anyone from voting. Instead, they're neutral, generally applicable rules governing how people vote. And nothing in the right to vote exempts voters from having to comply with ballot casting rules. To the contrary, the right to vote contemplates that those rules exist. It is a right to take all action necessary to make a ballot effective. If more were somehow needed, both the federalism canon and constitutional avoidance dictate the conclusion that the materiality provision does not extend to ballot casting rules like SB 1's identification rules. The District Court's construction would imperil a broad swath of common sense and commonplace election regulations, including signature requirements, witness requirements, dating requirements, secrecy envelope rules, and overvote prohibitions. It would transfer an enormous bulk of state's constitutional authority to regulate elections to the federal courts. There's no exceedingly plain statement warranting this result in the provision itself, and nothing in the record before the enacting Congress would support it. So for each of these reasons, the Court should reverse and need not even address the question of whether the identification rules are material. I'd like to address briefly an argument made by the other side. They cite to the definition of vote that is applicable to the materiality provision. They claim that that definition is so broad that it transforms the provision from a narrow regulation and properly focused regulation on the record before the enacting Congress of voter qualification and registration into a regulation of all aspects and steps in the voting process. But they're wrong about that for at least four reasons. First, that statutory definition applies to the other subsections of Section 101A, which indisputably apply to voter registration and qualification exclusively. So that statutory definition without more cannot extend the materiality provision outside of the voter qualification and registration context. Second, if Congress had intended the materiality provision to extend beyond voter qualification, it would have written a much different statute, as we point out on page one of our reply brief. It would not have limited the provision to denials of the right to vote, applications, registrations, or other acts requisite to voting, or rules used in determining whether an individual is qualified to vote. It would have omitted all of that narrowing language, but Congress included that language, and that language must be given effect. That effect is to limit the provision to voter qualification and registration rules. Third, the statutory definition of vote itself bears this out. It recognizes that voters must take all action necessary to make a vote effective. The provision, therefore, protects the right to take those actions, not a right to be exempt from those actions. What the district court and appellees seek here is a right to be exempt from these rules, but even the statutory definition of vote acknowledges that those rules apply and are binding on voters. And finally, even if the district court and the appellees were correct about the definition of vote, their claim would still fail. The SB1 identification rules still would fall outside the provision because they don't relate to an application, registration, or other act requisite to voting, and they're not used in determining voter eligibility. So for all of those reasons, the court should reverse. It need not address whether these rules are material within the meaning of the statute. We certainly agree with the state's arguments that if the court proceeds to apply the vote.org framework, it should hold that these rules are material for the reasons the state has explained and we have also laid out in our brief. But there is ample occasion for this court at every turn to reverse because at every turn, the materiality of the provision does not even apply to and certainly does not invalidate SB1's common sense identification rules. Unless the court has any further questions, we ask the court to reverse. Okay. Thank you, Mr. Gore. Welcome, Mr. Savitsky. Did I get that right? Yes, Your Honor. Thank you very much and may it please the court. Ari Savitsky for the OCA Appellees and two opening points to start. Before you get started, I guess we're only hearing from you today. That's correct. Not the United States. That's correct. The United States has ceded its argument time to us and stands on its papers as a representative of the parties prior to argument. Two opening points, one on the facts and one on the law. On the facts, states no question have an interest, as the court recognized in vote.org, in making sure that mail ballot voting and making sure that voting in general is secure. It's a generalized interest. Texas does that with an extensive signature matching process, digital tracking, wet signature requirements, criminal penalties, and that's not what this is here. What Judge Rod Regis found based on extensive record is that election officials do not use this ID match to confirm voters' identities, but just to reject their voting materials. So this number match is a stumbling block that is placed before the disabled voters and the senior citizens who vote by mail in Texas. That's what the record showed. That's what Judge Rod Regis found. And on the law, to make one other opening and general point, the provision applies here as a matter of plain text. This gets to Mr. Gore's arguments. It doesn't apply only to registration papers. We pass up a bench book with statute. Statute says which papers it applies to. It applies to immaterial errors on any paper, record or paper relating to any application, registration, or other act requisite to voting. So registration is in there. One of the papers it applies to is a record or paper relating to registration. But you can't delete the terms application or other act requisite to voting from the statute. So there is a better way to read this statute on this question, and only the written word is law. So, Your Honors, I want to address some of the points that my friends have made. I would just back up and say I think the sort of tougher question here is whether this requirement is in fact material. I think as a matter of plain text, the statute applies to the paperwork that's put before voters, and we can tell you about why when we talk about it in our brief. But the question is, is this material? Is the number match material? And first of all, we would say it's not. You can affirm across the board, based on the summary judgment record, applying the standard that this Court laid out in vote.org, right? Because while the State has a general interest in ensuring that voters are who they say they are, no question, that interest is not substantially advanced by this number match. Voters are being asked to match to an in-house database, not to the Social Security Administration. But the fact that it — your theory essentially is that it's redundant. It's not necessary. You've got other mechanisms. But the test here is material. That's correct. That's a different inquiry, isn't it? So I — It may or may not be redundant, but it is surely material to the question of whether somebody is qualified. It's making sure that you are who you say you are. So I don't think it does go to that. And again, the record is that State election officials don't use this information to confirm that a voter is who they say they are. They use other information. And District Court discussed this at 33-22-4 and 22-5. But in deposition after deposition — I'm not sure that makes it immaterial. It may make it unnecessary. It may make it all sorts of other things. Well, it indicates that it's not used for that purpose. And one of the most obvious reasons why it's not and can't be used for that purpose is because the team database contains millions, literally millions, of either errors, omissions. So — and again, what's a voter being asked to do? They're not being asked to provide a current ID. They're not — and this gets to a point that Ms. Hunker made — this is not the equivalent of photo ID for vote by mail. The equivalent of photo ID for vote by mail — and North Carolina and other states do this — is having folks photocopy their ID and send it in. And I might not like that as a matter of policy. Would that violate the materiality provision? I don't think the materiality provision has anything to say about that because the materiality provision only applies to voter — paperwork that voters are required to fill out. Information that they supply is the information material in determining the substantive qualifications to vote. That's — that is what the materiality provision applies to, excuse me. And it's a very targeted provision because that is the specific type of practice that Congress was looking at. And so they wanted to make sure we cover any paperwork. We don't want to do a self-defeating statute where a voter can register and then they come to the polls and they have to fill out a ballot application at the polls with a bunch of immaterial questions, right? But they didn't extend beyond that. So there are all manner of time, place, and manner of restrictions and requirements that may go to election securities. Texas could add even more of them. This specific — I want to make sure I understand your response to Judge Willett. A photo requirement in lieu of this ID requirement, the number requirement, that's okay because that would be material or it's okay for another reason under the statute? First of all, I think there would be an argument, and I don't want to foreclose myself or anything, but I think there would be an argument the statute just doesn't apply because, again, looking at the text of the statute, any record or paper relating to any application, registration, or other act requisite to voting, right? So the acts requisite to voting, the coverage under the statute is paperwork that voters are required to fill out and supply information. So it's not an issue in this case, but do you want to apply eustem generis? Do you want to look at what the statute applies to? I think it requires the paperwork that's put in front of a voter and whether the information they're asked to fill out goes to their qualifications. But being asked to submit a photo ID with their mail ballot might not apply. But it also would be much more material, right? It would go much more directly to whether the photograph and their information, whereas what we have here is matching to a database that may have your expired driver's license from 30 years ago. Remember, HAVA was passed in 2004. There are many folks who are seniors eligible to vote by mail in Texas who registered before 2004, right? They might not have in that team database their DPS, the right DPS number. They may have gotten a driver's license after that. So you're being asked to match to a database that is full of errors. And getting the right number... I guess what I'm hearing is sort of an elevation of what materiality requires. You're saying this is not ideal, it's imperfect, it's got flaws, there are better ways. I'm not sure that means it's immaterial. It may be not ideal. So I think it's immaterial under the test that the court laid out in Vote.org. And this, I think, gets to the point that I wanted to make about an alternative way to resolve this case. Because Vote.org says we do a two-step analysis, right? First we look at the fit. We say, what's the state interest and is the particular provision, does it have some non-tenuous relationship? And then if there is a non-tenuous relationship, and let's assume there is, you go to the second step and you say, is that interest substantially advanced without creating pointless burdens for voters? And I think weighing the tens of thousands of voters who have had their ABBMs and VBMs denied versus the fact that these number matches are not actually used to detect fraud or to confirm voters' identities, according to the record, and according to Judge Rodriguez's decision, that balance shakes out in favor of this not being material. And it's undisputed... In other words, it's such a poor vehicle for getting this done that it becomes immaterial. I think that's right. That's the core of your theory. And I think that's the core of our argument under Vote.org, and because that's the test that Vote.org lays out. And let me just propose one other thing for the court in terms of the remedy here while we're on the topic. You know, we recognize the Vote.org decision was decided after Judge Rodriguez issued his summary judgment opinion. And so Judge Rodriguez didn't have the benefit of that decision. And no question, our view is you can affirm across the board. You can affirm on these dispositive legal issues that my friends raise because the statutory text says that the materiality provision applies to any voting paperwork that voters are required to fill out. And you can affirm on the merits because for all the reasons we've just said, applying the Vote.org test. But the other resolution that could be acceptable or reasonable in this case, and we talk about this in a footnote, we cite the Vicknayer case from this court, is first, resolve those dispositive legal issues, hold that the statute applies in this case, and reject the idea that we can delete text from the statute and cabinet-only registration, but then vacate and remand so that the district court can apply the standard from Vote.org. Maybe that's at renewed motions for summary judgment. Maybe that's at trial. But that, I think, would be another reasonable way to resolve this case that I think gets at the fact that maybe there's additional fact development or additional argument that could be made under that Vote.org standard. So don't get me wrong. We are absolutely asking for this court to affirm across the board. But I think that would be another reasonable way to resolve this case that would have sufficient fidelity to the statutory text, which controls, but also recognizes that we do have a new standard for the materiality provision in this circuit. And maybe if the court has questions about how it applies here, the right place for that to be applied in the first instance is the district court. So, Your Honors, I'd touch on a couple more points. I certainly have time to do so. Let me ask you just a few more examples on whether, in your view, the materiality provision would apply and validate various requirements. So there's a provision of the Election Code 63002. I'll just read it. It provides that, quote, a voter who is accepted for voting must sign the signature roster before the voter is permitted to vote. So at this point, the voter has already presented ID, has already been confirmed as eligible, has been accepted for voting. So does that requirement and other kind of signature requirements, would that violate the materiality provision? Not necessarily. And the reason why is this. Most of the signature requirements that you have, and I would think in that provision and in a lot of the other provisions that are cited by my friends in their briefing, are signatures where a voter signs and says, I am the person who is qualified to vote. This is what I want to do. I'm requesting a ballot, or I'm requesting a mail ballot. These are my true intentions, or these are my wishes, which is on the carrier envelope. So a voter is attesting, if a voter is attesting to their qualifications, then that goes to whether they're qualified to vote. So I think that's a very tough case to make under the materiality provision that a voter's signing, usually under penalty of perjury, and this sort of gets to the point of vote.org. Vote.org is such a different case because it involved a situation where the voter is signing, looking at, and what the court said is, it's important that voters see the warnings about criminal penalties, see the attestation that they're giving, and the court was, and Texas was entitled to doubt technological substitutes. So the act of signing itself had value and advanced the state's interest. So if I heard you right, that was a, it would not necessarily violate the materiality provision. I think I would go so far as to say that a signature requirement for an attestation that you are qualified to vote doesn't, almost certainly, well, let me put it this way, it would be extremely difficult to win under the vote.org standard. Again, the vote.org standard is a totality of circumstances test. What about a rule that required a voter to check a box confirming that he filled out his mail-in ballot on his own? I think that potentially wouldn't be material to whether you're qualified to vote. Again, it depends on what's the state interest that's being advanced. The vote.org test that's laid out by this court is a fact-dependent one. I mean, the totality of the circumstances tests typically are. I think that an argument could certainly be made. And here's the other point. If you are, if your vote isn't counted because someone else voted your ballot, you're not being, you're not being denied the right to vote because you made some error on a paperwork form. You'd be denied the right to vote because you're not the one who voted. Right? So I think there's another way to look at this entirely. Really what we're talking about here, the core prohibition in this statute is foisting unnecessary paperwork requirements, asking for unnecessary immaterial information from voters, and then having that be a barrier to the exercise of the franchise. So that's what's happening with this number match requirement. But again, so many of the other examples are genuine requirements that you affirm your qualifications, you ensure that you're complying with the other rules of voting. So for example, secrecy envelope is another great example. It's not an error, I wouldn't think, on record or paper, filling out information to use that secrecy envelope that's required. The materiality provision, it prohibits states from denying, and that's the word that is later, includes both denial of the right to vote and abridgment of the right to vote. The materiality provision only refers to denying. Is that wording difference, that omission relevant? So I think it certainly creates a difference in the coverage of the statute, but it's not relevant here. If you look at Section 2, I mean, Section 2 provides that there can be a violation of the statute for a districting scheme that doesn't affect at all anyone's ability to actually go to the polls and cast a ballot. That's abridgment. There can be abridgment where no one's voting, no one's right to go into the polls or actually submit their ballot and have it counted or affected. And so abridgment is extending the statute in those types of situations. We do have vote denial here. We have thousands of voters who attempted to vote under the rules that the right to vote means to vote however the state allows you to make a ballot effective. Texas absolutely has discretion to have mail ballot voting, to not have mail ballot voting, to extend it to seniors, to extend it to everyone. But once it extends the ability to vote by mail, then the materiality provision covers that right to vote, to make a ballot effective under whatever mechanisms the state has allowed. And there is vote denial in this case for that reason. I mean, folks had their ABBMs denied, and they had their mail ballots denied. So I think this fits comfortably within vote denial, and that's consistent with cases. On the jurisdictional question against the Secretary of State, I think the issue of whether the Secretary gets immunity is pending before a different panel of this court. You're aware of that? Yes, Your Honor. Has that been argued? It has been argued. I believe it was argued some time ago. I believe it was argued over a year ago. So, and I obviously can't speak to the status of the case beyond that. So, obviously, if that panel decides that there is immunity, you would have no claims against the Secretary. I think that's right, Your Honor. And I would point out there are other defendants. Right. But I would just make one other point, and we sort of highlight this in our brief. I think at this point there's a real question of whether there's a waiver of sovereign immunity. Now, the summary judgment motion that was made here, the state joined in asking the district court to enter a merits judgment in its favor. And then, of course, the state court's decision to reverse and render, that's all happened after the initial sovereign immunity argument. And there was never a request to stay the proceedings. Instead, the state availed itself of the district court's jurisdiction. Now, this court's jurisdiction to seek merits judgments. So we cite the Ninast case, for example, and a few others at the end of our brief around pages 74, 75. But the state can't simply lay back and watch the litigation, much less affirmatively ask courts to exercise jurisdiction in their favor while maintaining, certainly not without even a request for a stay. But are those authorities cases where an appellate panel, like the three of us, decided the merits of a case while an interlocutory appeal was pending before a different panel? So I don't think those cases had that particular element to it, that there was also an interlocutory appeal pending. But again, there's been no effort, there's been no motion to stay the proceedings, and there's been no action. I mean, call it waiver, call it estoppel, but the state has availed itself of the court's jurisdiction. So I actually think, in some ways, this case is a sort of more pronounced and unique version of that general principle that the state can't affirmatively avail itself of the litigation process and the court's jurisdiction. But, Your Honor, I certainly recognize that the court's rules of order would have something to say about how it deals with a pending case in front of a prior panel, and I wouldn't want to suggest otherwise. So, Your Honor, just looking at some of the points that were raised, my friend talked about the Third Circuit's decision. I mean, we can talk about the text of the statute. The Third Circuit recognized that its reading of the statute creates redundancies. It said what it was doing is sort of a wag the dog reading of the statute. This court absolutely can do better. I think the text is absolutely clear. And in the end, and my friend made these arguments, you know, talked about sort of the consequentialist point, this is going to affect many different types of state statutes. I don't think that's right for the reasons that we discussed, Judge Willett. But I'd also point, again, to what Judge Gorsuch reminded us, which is when the counsel's in favor of one reading and extra textual considerations go another way, it's no contest. It's no contest. Only the written word is law. And frankly, a lot of the statutes that my friend cite do not go this far, do not do what the Texas statute does. There is no other state that has a number matching process like this by which tens of thousands of voters are disenfranchised. And I would just cite in my 15 seconds left Minnesota Statute 203B1212B3. My friends say that Minnesota has a similar statute. It doesn't. It says if you do a match with the numbers and it doesn't work, do a signature match. Texas does that already. Texas has adopted sufficient rules to protect its interests. The number matching provision does not advance those interests. It imposes pointless burdens of the stumbling block for voters in the courts you affirm. Okay. Mr. Savitsky, thanks very much.  Appreciate your argument. Ms. Hunker, you're back for a whopping five minutes. Thank you, Your Honor. My friends on the other side are making this a much more complicated matter than it needs to be. And that is because the materiality provision as a matter of law does not apply here, both for the statutory reasons listed by Mr. Gore, but also because it doesn't implicate the right to vote. This court draws a distinction between the right to vote and the statutory privilege of casting a ballot by mail. Vote.org applied to the former. This case applies to the latter. It's an accommodation, and any rule that is designed to expand voter access cannot be read as to abridge the right to vote, much less deny the right to vote. In addition, even if we were to talk about the materiality provision and whether or not this is material, plaintiffs have raised a facial challenge, and so the burden on them was to show that there was no set of circumstances in which the act would be invalid. They also are, under Rahimi, were supposed to consider circumstances in which the statute is most likely to be valid, as opposed to the far-fetched scenarios or unlikely scenarios where it could be perhaps in conflict with the law. Moving on to some of the more factual disputes here, the record does show that counties use the identification numbers to confirm identity. Denton County election official expressly stated that his office routinely looks at the identification numbers to confirm the identity. The district court, when it was explaining that counties do not, were actually citing something different. In that case, Travis County, Harris County, what they're referring to is locating a voter's registration file in their database. Now, you can use the identification numbers to locate a file, but that's not its principal purpose. The principal purpose of this rule is to confirm that the individual submitting the form and the person who is listed on the database are one and the same, and that is something that the counties are doing implicitly whenever they are entering the number to see if there is a match, and it is expressly what Denton County, as well as the Secretary of State, understands the law. Council also raised up the question of redundancy. First, the materiality provision does not prevent a state from using both a belt and suspender's approach when it comes to regulating its elections. However, even if it did, the materiality provision wouldn't be implicated here because the identification number is not redundant. Texas does not use a signature comparison at the application for ballot by mail stage. In addition, one of the signatures that's used in confirming the ballots is the application itself, and so the signature requirement can be very useful whenever a ballot is intercepted. When it was lawfully requested and sent out but somehow intercepted by someone who has bad designs, it is not as useful in the case when a person is forging an application because the ballot's signature will be compared to that signature. And we don't have to scratch our heads for an example. There's actually one in the record in 2020. A mayoral candidate in the city of Carrollton attempted to stack the deck in his favor by forging applications. The Denton County election administrators identified the fraud only after some applications were accepted, and had that not occurred, there's a good chance that those ballots would have gotten through because the signature would have matched the person who was submitting the ballot itself. Denton County election administrators stated that had the identification numbers been in place at the time, that individual would not have been able to attempt the fraud because he would have not had access to those identification numbers in the first place, and so it would have prevented the fraud from occurring. Lastly, I want to quickly address the errors component. Every system has some degree of errors. However, what the plaintiffs have not done is establish that those errors were responsible for any of the rejections. In the November 2022 election, you had only 6,355 ballots that were rejected and not cured by the voter because of the SB1 number requirement. That is out of 332,000 ballots cast by mail that election, and out of 8.1 million ballots cast overall. And so you're talking about less than one-tenth of one percent. The fact is, for the vast majority of cases, the identification number requirement works as it's supposed to by discouraging fraud and confirming the identity of voter and giving the security that Texans deserve with respect to their election. Were plaintiffs' interpretation accepted, it would simply seize power from the states and then give the considerable discretion that should belong to them under the Constitution to the court, and so we ask that you please uphold this common-sense provision. Thank you. Okay, Ms. Hunker, thank you very much. We appreciate the arguments from counsel.